# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 1, 2017   Decided March 16, 2018

No. 16-1176

NORTHWESTERN CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MONTANA CONSUMER COUNSEL, ET AL.,
INTERVENORS

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*John Lee Shepherd, Jr.* argued the cause for petitioner. With him on the briefs were *Clifford M. Naeve*, *James P. Danly*, *Heather H. Grahame*, *M. Andrew McLain*, and *Timothy T. Mastrogiacomo*.

*Holly E. Cafer*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Christina F. Gomez* argued the cause for intervenors. With her on the brief were *Kathleen L. Mazure*, *Thorvald A. Nelson*,

and *Michelle Brandt King*. *John P. Coyle*, *Natalie M. Karas*, and *Justin W. Kraske* entered appearances.

Before: KAVANAUGH and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: The Federal Energy Regulatory Commission requires utilities that transmit electricity to supply extra power generation in order to balance moment-to-moment variations in demand for electricity. Utilities must add power to, or withdraw power from, the grid in real time as actual demand for electricity exceeds or falls short of projected demand. That extra power generation is known as regulation service.

FERC allows utilities to recover costs associated with the provision of regulation service. Utilities may recover those costs by charging them to customers, as long as the utilities charge rates that are "just and reasonable." 16 U.S.C. § 824d(a).

NorthWestern is an electric utility that is subject to FERC's regulation-service requirement. Before 2011, NorthWestern lacked the generating capacity to provide its own regulation service, so it met the requirement by purchasing regulation service from other utilities. With FERC's approval, NorthWestern then passed on the cost of that purchased regulation service to its wholesale and retail customers. But purchasing regulation service from other utilities eventually became too expensive, so NorthWestern built a new generating station dedicated to providing regulation service. NorthWestern then proposed to revise the rate that it charges

customers for regulation service in order to recover the costs of providing that service from the new station.

FERC determined that NorthWestern's proposed rate was not just and reasonable. FERC therefore modified NorthWestern's proposed rate and ordered NorthWestern to refund its customers the difference between the proposed rate and the modified rate. NorthWestern challenges FERC's decision as arbitrary and capricious under the Administrative Procedure Act. The arbitrary and capricious standard requires that an agency's decision be reasonable and reasonably explained. We conclude that FERC's decision in this case was reasonable and reasonably explained, and we therefore deny the petition for review.

I

In 1996, FERC issued Order 888. 61 Fed. Reg. 21,540 (May 10, 1996). Among other things, Order 888 requires electric utilities to provide their customers with certain ancillary services – services that supplement the basic service of transmitting electricity. *Id.* at 21,579-80. One such ancillary service is "regulation service." Regulation service is extra power generation that responds to "moment-to-moment variations" in demand for electricity in a given area. *Id.* at 21,582. In other words, regulation service is "the injection or withdrawal of real power" into or from the electric grid in response to fluctuations in demand for electricity. Order No. 755, 76 Fed. Reg. 67,260, 67,260-61 (Oct. 31, 2011). Regulation service helps to prevent blackouts and equipment damage by keeping the frequency of the electric current at close to 60 Hertz, the standard frequency in the United States. *Id.* If a utility fails to maintain that frequency, FERC may impose civil penalties on the utility. *See* 16 U.S.C. § 825*o*-1.

4

A utility charges customers for regulation service under Schedule 3 of the utility's Open Access Transmission Tariff, which is filed with FERC. FERC must examine the rate that a utility proposes to charge Schedule 3 customers in order to ensure that the rate is "just and reasonable." 16 U.S.C. § 824d(a), (e). A just and reasonable rate must be fair both to the utility and to its customers: It "should be based on the costs of providing service to the utility's customers, plus a just and fair return on equity." *Alabama Electric Cooperative, Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982); *see also FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944).

This case concerns an attempt by petitioner NorthWestern to revise its Schedule 3 rate. NorthWestern is an electric utility subject to FERC's regulation-service requirement. As relevant here, NorthWestern transmits electricity to wholesale and retail customers in Montana.[1] When NorthWestern first began operations in 2002, NorthWestern did not possess sufficient generating capacity to provide its own regulation service. So NorthWestern complied with Order 888 by purchasing regulation service from other utilities. NorthWestern contracted with those other utilities for a set amount of regulation service and passed the cost of that regulation service on to customers under Schedule 3. From 2002 to 2010, NorthWestern purchased, and passed on the cost of, 60

---

[1] The record is not clear about the precise makeup of NorthWestern's customer base. According to FERC, NorthWestern's customers – presumably its wholesale customers – include generators and "load-serving entities." Respondent's Brief at 1. Load-serving entities are utilities that supply electricity to homes and businesses. NorthWestern's retail customers appear to include industrial energy customers such as refining companies, *see* Intervenors' Brief at ii, 1, but may also include commercial and residential customers. Regardless, the exact makeup of each customer class does not affect the resolution of this case.

megawatts of regulation service each year to its Schedule 3 customers.

But NorthWestern eventually decided that purchasing regulation service from other utilities was inefficient. So NorthWestern built the Dave Gates Generating Station, a station dedicated to providing regulation service to NorthWestern's customers. The Gates Station has three generators, each with a maximum capacity of 50 megawatts, for a total nominal or "nameplate" capacity of 150 megawatts. The Gates Station began operating in January 2011.

Whereas NorthWestern had previously passed on to its Schedule 3 customers the cost of purchasing regulation service from other utilities, NorthWestern now wanted to recover from its customers the cost of providing regulation service from the Gates Station. So NorthWestern filed a proposed revised Schedule 3 rate for FERC's approval. NorthWestern filed its rate pursuant to Section 205 of the Federal Power Act, which places the burden on the utility to show that its proposed revised rate is just and reasonable. 16 U.S.C. § 824d(e).

Here is how NorthWestern proposed to recover the cost of providing regulation service from the Gates Station. First, NorthWestern calculated the Gates Station's revenue requirement – the station's costs plus an allowed rate of return. NorthWestern then divided the Gates Station's revenue requirement between two different groups of customers. The first group of customers included retail customers only. In Montana, retail customers pay for wind-generated electricity in addition to fuel-generated electricity. Retail customers pay for wind-generated electricity at state-approved rates; FERC does not enter into the picture, and utilities do not use Schedule 3 to recover the cost of regulation service associated with wind-generated electricity. Because NorthWestern calculated that

retail customers would need 45 megawatts of regulation service just to support wind-generated electricity, NorthWestern intended to charge retail customers alone for 45 megawatts of regulation service, and to do so at the state-approved rate – separate from Schedule 3.

The second group of customers included both retail and wholesale customers. Both retail and wholesale customers pay for regulation service associated with fuel-generated electricity at FERC-approved rates under Schedule 3. NorthWestern determined that this second group of customers would need 60 megawatts of regulation service – the amount that NorthWestern had historically purchased from other utilities. So NorthWestern proposed to recover the cost of 60 megawatts of regulation service from this second group of customers under Schedule 3.

In other words, NorthWestern planned to use the Gates Station to supply a total amount of 105 megawatts of regulation service to all of its customers. Retail customers alone would pay for 45 megawatts of that total – 43% – at a state-approved rate, separate from Schedule 3. Retail and wholesale customers together would pay for the remaining 60 megawatts of that total – 57% – under Schedule 3. NorthWestern calculated its proposed Schedule 3 rate by multiplying the Gates Station's revenue requirement by .57, which is the ratio of 60/105.

Three other components of NorthWestern's proposed Schedule 3 rate also matter here. First, NorthWestern planned to use Schedule 3 to recover fuel costs associated with operating the Gates Station, but also planned to credit customers for any revenue that the Gates Station might bring in from anything other than providing regulation service, such as from "off-system sales" – sales of energy to third parties. NorthWestern indicated, however, that it did not actually plan

to use the Gates Station for anything other than regulation service. Second, NorthWestern proposed to recover costs associated with a three-month outage of the Gates Station that occurred in 2012. During that outage, NorthWestern once again had to buy regulation service from other utilities. NorthWestern planned to pass the cost of that purchased regulation service on to its customers under Schedule 3. Third, NorthWestern also sought approval to pass on to customers the cost of any regulation service that NorthWestern might need to purchase in the future in the event of another Gates Station outage.

In sum, NorthWestern asked FERC to approve a revised Schedule 3 rate that: (1) charged customers for regulation service by multiplying the Gates Station's revenue requirement by the cost-calculation ratio of .57; (2) charged customers for fuel costs, but credited customers for any revenue the Gates Station might bring in from off-system sales and other non-regulation-service sales; (3) charged customers for the regulation service that NorthWestern purchased for three months during the 2012 outage; and (4) charged customers for any regulation service that NorthWestern might need to purchase during future outages.

The administrative law judge assigned to NorthWestern's case concluded that several aspects of the rate were not just and reasonable. The ALJ reduced NorthWestern's proposed rate by: (1) multiplying the revenue requirement by a different cost-calculation ratio of .13, which is 19/150; (2) excluding fuel costs from the Schedule 3 rate altogether and rejecting NorthWestern's crediting arrangement; (3) requiring NorthWestern to make a separate filing to recover costs associated with the 2012 outage; and (4) requiring NorthWestern to make separate filings before charging

customers for any regulation service that NorthWestern might need to purchase during future outages.

FERC affirmed the ALJ's decision in all respects. FERC ordered NorthWestern to refund its customers the difference between NorthWestern's proposed rate and the lower rate that FERC ultimately approved as just and reasonable. FERC denied NorthWestern's request for rehearing.

NorthWestern timely petitioned for review in this Court. We review FERC's order under the Administrative Procedure Act's arbitrary and capricious standard. That standard requires that FERC's decision be reasonable and reasonably explained.

II

NorthWestern raises four challenges to the revised rate that FERC approved.

*First*, NorthWestern maintains that FERC unreasonably reduced the numerator of NorthWestern's proposed cost-calculation ratio. The numerator reflects the number of megawatts needed to serve Schedule 3 customers. FERC reduced the proposed numerator from 60 to 19 megawatts after determining that only 19 megawatts were needed to serve Schedule 3 customers.

Along with some other exclusions not at issue here, FERC excluded the megawatts associated with "regulation-down" capacity from the numerator. NorthWestern contends that it was unreasonable to exclude regulation-down capacity from the numerator. We disagree.

"Regulation down," a component of regulation service, is the capacity associated with operating a generator at a set point,

a steady point from which the utility can quickly ramp down if demand for electricity suddenly drops. The energy generated as a by-product of operating at a set point can potentially be used for non-regulation-service purposes – for example, it can be sold to third parties in "off-system sales."

NorthWestern operates its Gates Station generators at a set point in order to reserve capacity for regulation down. But NorthWestern does not sell the energy thereby generated. NorthWestern nonetheless proposed to recover from its Schedule 3 customers the costs of reserving regulation-down capacity. The ALJ rejected NorthWestern's proposal and subtracted the megawatts associated with regulation-down capacity from NorthWestern's proposed numerator after determining that NorthWestern had neither produced adequate data to show how much regulation-down capacity the Gates Station would need to reserve, nor explained why NorthWestern could not recover its costs in some other way, such as by selling the energy.

FERC affirmed the ALJ's decision and added some further analysis, focusing primarily on NorthWestern's failure to demonstrate that it could not recover its costs through means such as off-system sales. Drawing on other cases excluding regulation-down capacity from cost calculations, FERC applied the principle that animated those cases: Customers should not pay for what is essentially a backup service if the utility can recover its costs by using or selling the energy that it generates as a by-product. *See NorthWestern Corp.*, 155 FERC ¶ 61,158, at ¶¶ 33-36 (2016); *see also Kentucky Utilities Co.*, 85 FERC ¶ 61,274 (1998); *Allegheny Power Service Corp.*, 85 FERC ¶ 61,275 (1998). NorthWestern, FERC acknowledged, might be in a different situation: It was possible, for example, that the location of the Gates Station might make off-system sales infeasible. If so, then

NorthWestern might be able to show the justness and reasonableness of charging Schedule 3 customers for the costs of reserving regulation-down capacity. But FERC concluded that NorthWestern had failed to produce sufficient evidence to support such a showing. *See NorthWestern Corp.*, 147 FERC ¶ 61,049, at ¶ 48 (2014). And because it was NorthWestern's burden under Section 205 to show that its proposed rate was just and reasonable, that failure was fatal. FERC therefore reasonably excluded the megawatts associated with regulation-down capacity from the cost-calculation ratio.

NorthWestern's several rejoinders miss the mark. NorthWestern maintains that FERC lacked authority under Section 205 to reduce the numerator of NorthWestern's proposed cost-calculation ratio. Because NorthWestern previously passed on the cost of 60 megawatts of purchased regulation service with FERC's approval, NorthWestern argues that the 60-megawatt amount was "embedded" in NorthWestern's original rate. Petitioner's Brief at 40. And because FERC (i) must act under Section 206 of the Federal Power Act in order to modify an existing rate component and (ii) may modify an existing rate component under Section 206 only after showing that the existing rate component is *not* just and reasonable, NorthWestern contends that FERC made an "end-run" around Section 206 by (i) modifying an existing rate component in a Section 205 proceeding and (ii) placing the burden of proof on NorthWestern. *Id.* at 41; *see* 16 U.S.C. § 824e; *Public Service Commission of New York v. FERC*, 642 F.2d 1335, 1345 (D.C. Cir. 1980) (utility bears burden of proof on those parts of its proposed rate that depart from status quo, but not on those parts that are "constant elements" of the previous rate).

NorthWestern is mistaken. The 60-megawatt amount was never "embedded" in any rate formula that FERC previously

approved because it was never a component of a traditional cost-of-service rate. Rather, FERC previously allowed NorthWestern – as a temporary expedient – to pass on what it cost NorthWestern to procure a set amount (60 megawatts) of regulation service from third parties. NorthWestern's proposed revised rate, which is structured as a traditional cost-of-service rate, departs from the previous status quo. NorthWestern therefore had to justify its entire revised and redesigned rate, including all of the rate's components, as FERC explained. *NorthWestern Corp.*, 155 FERC ¶ 61,158, at ¶¶ 27-29; *see Kansas Gas & Electric Co. v. FERC*, 758 F.2d 713, 719-20 (D.C. Cir. 1985) (utility proposing rate clause that departs from previous status quo bears burden of proof). So FERC properly assigned NorthWestern the burden of proof in this Section 205 proceeding.

In another burden-shifting attempt, NorthWestern contends that FERC failed to identify other customers who might bear NorthWestern's cost of reserving regulation-down capacity. But it was not FERC's burden to identify alternative ways for NorthWestern to recover its costs (although FERC did suggest some ways). Instead, it was NorthWestern's burden to show that its proposed rate was just and reasonable – here, for example, by showing that no other such customers could be identified.

NorthWestern also objects that, in reducing the numerator, FERC failed to account for NorthWestern's proposed crediting arrangement, which would have credited NorthWestern's Schedule 3 customers the value of any off-system or other non-regulation-service energy sales that NorthWestern might manage to make. But FERC reasonably declined to discuss the crediting arrangement. The proposed crediting arrangement assumed the very point that NorthWestern needed to prove:

that Schedule 3 customers should bear the cost of reserving regulation-down capacity in the first place.

In short, FERC reasonably modified NorthWestern's proposed cost-calculation ratio by excluding the megawatts associated with "regulation down" from the numerator. We therefore reject NorthWestern's first challenge.

*Second*, NorthWestern contends that FERC arbitrarily increased the denominator of NorthWestern's proposed cost-calculation ratio from 105 megawatts to 150 megawatts. We disagree.

Recall that 105 megawatts is the total amount of regulation service that NorthWestern planned to provide from the Gates Station – 45 megawatts associated with wind-generated electricity, plus 60 megawatts associated with fuel-generated electricity. NorthWestern proposed to use that 105-megawatt figure as the denominator of the cost-calculation ratio in order to charge Schedule 3 customers for their portion of the total amount of regulation service that NorthWestern planned to provide from the Gates Station.

Under FERC precedent, however, the denominator should reflect the nameplate capacity – here, meaning the number of megawatts that the Gates Station had the capacity to produce, not just the megawatts that NorthWestern planned to devote to regulation service. *See Westar Energy, Inc.*, 130 FERC ¶ 61,215, at ¶ 40 (2010); *NorthWestern Corp.*, 140 FERC ¶ 63,023, at ¶¶ 148-150 (2012). The record evidence established that each of the three generators at the Gates Station had a capacity of 50 megawatts, for a total of 150 megawatts. FERC therefore reasonably increased the denominator to 150 megawatts.

NorthWestern retorts that, because FERC's ratio uses "the nameplate *capacity*" as the denominator "despite using customer *demand* for regulation service as the numerator," the ratio is somehow unreasonable. Petitioner's Brief at 32-33. We disagree. The denominator measures the Gates Station's total capacity, and the numerator measures the portion of that total capacity that is needed to provide regulation service to Schedule 3 customers.

Because FERC acted reasonably in modifying the denominator, we reject NorthWestern's second challenge to FERC's decision.

*Third*, NorthWestern maintains that FERC wrongly rejected NorthWestern's proposal to recover fuel costs under Schedule 3. More particularly, NorthWestern argues that FERC inadequately explained its decision not to allow fuel costs, and failed to account for the fact that NorthWestern may not be able to recover fuel costs retroactively under Schedule 4. FERC's explanation, however, was adequate.

FERC adopted the ALJ's reasoning, which explained that FERC ordinarily requires utilities to recover fuel costs under Schedule 4, which governs "energy service," rather than under Schedule 3, which governs "capacity service." The two exceptional cases that NorthWestern identified both involved unusual circumstances, as the ALJ's decision noted. *NorthWestern Corp.*, 140 FERC ¶ 63,023, at ¶ 181. In addition, FERC was not persuaded by NorthWestern's argument about the potential difficulty of recovering past fuel costs under Schedule 4, because NorthWestern "admittedly never attempted" to recover those costs under Schedule 4. *NorthWestern Corp.*, 155 FERC ¶ 61,158, at ¶ 43. FERC's decision on fuel costs was reasonable and reasonably explained.

*Fourth*, NorthWestern argues that FERC acted arbitrarily by (1) requiring NorthWestern to make a separate Section 205 filing to recover costs associated with the 2012 Gates Station outage, and (2) requiring NorthWestern to make separate Section 205 filings before charging customers for any regulation service that NorthWestern might need to purchase during future outages. NorthWestern again maintains that FERC inadequately explained its decision and failed to consider the possibility that NorthWestern might not be able to recover costs associated with the 2012 outage retroactively. But FERC again adopted the ALJ's reasoning, which justified the separate proceedings on reasonable grounds – the need for more data related to the 2012 outage, and the need for case-by-case analysis of any future contracts. FERC acted reasonably here as well.

In sum, we find that FERC's decision on NorthWestern's proposed rate was reasonable and reasonably explained.

III

NorthWestern also challenges FERC's decision to order a refund of the difference between the higher rate that NorthWestern proposed and the lower rate that FERC approved. NorthWestern contends that FERC's refund decision resulted from faulty reasoning and an inadequate assessment of equitable factors. We are not persuaded.

The parties agree that FERC ordinarily does not order refunds in cases where a utility collects the appropriate total amount of revenue but improperly allocates it among different customer groups. The parties also agree that FERC ordinarily does order refunds in cases where a utility instead overcharges a given customer group. *See, e.g.*, *Black Oak Energy, LLC*, 139

FERC ¶ 61,111, at ¶ 11 & nn. 17-18 (2012).  But the parties disagree about how to classify this case.

FERC concluded that NorthWestern over-collected from its Schedule 3 customers, making this the kind of case in which FERC ordinarily orders refunds.  That determination was reasonable.  As FERC explained, the purpose of the Section 205 proceeding was to decide whether the revised rate that NorthWestern proposed to charge its Schedule 3 customers was just and reasonable.  The object of the proceeding was not to decide how to divvy up the Gates Station's revenue requirement among different customer groups. *NorthWestern Corp.*, 155 FERC ¶ 61,158, at ¶¶ 55-56.  Because FERC concluded that NorthWestern's proposed Schedule 3 rate was too high, FERC naturally also concluded that NorthWestern had overcharged, and therefore over-collected from, its Schedule 3 customers.

NorthWestern objects that the parties' frequent use of the word "allocate" throughout the proceeding demonstrates that this case was really about cost allocation.  True, the parties tossed that term around somewhat loosely.  But to make the classification of this case turn on the parties' imprecise use of the term "allocate" would be to ignore the substantive distinction that FERC's precedent attempts to draw between "cost-allocation" and "over-collection" cases.  NorthWestern's other objections take too narrow a view of FERC's relevant precedents and rely on comparisons to dissimilar cases.  Put simply, FERC reasonably determined that NorthWestern over-collected from its Schedule 3 customers in this case.

Even so, NorthWestern contends that FERC did not adequately assess the relevant equitable factors before imposing the refund order.  But FERC considered the argument that NorthWestern acted in good faith, and found it irrelevant

to the question whether FERC should depart from its general policy of ordering refunds in over-collection cases. FERC also considered the fact that NorthWestern was on notice about a potential refund order from the start of the proceeding, when FERC accepted and suspended NorthWestern's proposed rate subject to refund. After considering those factors, FERC decided to treat this case like an ordinary over-collection case and order a refund. That decision was reasonable and reasonably explained.

\* \* \*

We deny the petition for review.

*So ordered.*