# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 2, 2021          Decided June 10, 2022

No. 20-1238

CITY OF SALISBURY, NORTH CAROLINA,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CUBE YADKIN GENERATION, LLC,
INTERVENOR

———

Consolidated with 20-1457

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Robert J. King, III* argued the cause for petitioner. On the briefs were *V. Randall Tinsley, Kyle Woosley,* and *Julia C. Ambrose. Joseph A. Ponzi* entered an appearance.

*Jared B. Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Sharon L. White* and *Julia S. Wood* were on the brief for intervenor Cube Yadkin Generation, LLC in support of respondent.

Before: KATSAS and JACKSON,[*] *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion of the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The Federal Energy Regulatory Commission has licensed Cube Yadkin Generation LLC to operate a series of hydroelectric dams on the Yadkin River in North Carolina. The license requires Cube to develop a plan to protect a nearby water pump station from flooding. In the order under review, FERC approved a plan to do so by raising the station's sensitive equipment above the water levels expected during extreme flooding. We hold that this order correctly construed the license and was not arbitrary.

I

A

Two federal statutes govern the regulation of hydroelectric dams. The Federal Power Act makes it unlawful to operate such dams in the navigable waters of the United States without a license from FERC. 16 U.S.C. § 817(1). The Clean Water Act preserves the states' ability to regulate hydroelectric dams and other projects that "may result in any discharge" into

---

[*] Judge Jackson participated in the oral argument but not the decision of this case.

navigable waters. 33 U.S.C. § 1341(a)(1); *see S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 373–74 (2006). A FERC hydroelectric license thus is ineffective until the relevant state issues or waives a water quality certification, 33 U.S.C. § 1341(a)(1), which may impose conditions to control pollution or implement other state laws, *id.* § 1341(d). If FERC licenses a dam under the Federal Power Act, such state-imposed conditions become part of the federal license by operation of law. *Id*.

B

Since 1958, the federal government has licensed a hydroelectric dam project along the Yadkin River in central North Carolina. The project's northern-most facility is the High Rock Dam, which provides electricity for local communities. The dam has caused sediment deposits to accumulate, which has led to rising upstream water levels.

The city of Salisbury, North Carolina relies on the river for drinking water, which it obtains by operating a pump station about 20 miles upstream from the dam. Rising water levels pose two threats to the station. During moderate flooding, the river washes out its access road, preventing workers from reaching it. During severe flooding, the water level approaches the floor of elevated rooms that house the station's sensitive mechanical and electrical systems. Although such equipment has never suffered flood damage since the station was built in 1917, a storm in 2003 brought the water level to within a few feet of the equipment-room floor.

During re-licensing proceedings, Salisbury pressed its concerns with federal and state regulators. It asked FERC to require Cube's predecessor to build the city a new pump station in a less flood-prone area. FERC staff recommended a more

modest requirement—development of a flood protection plan for the existing station. The Commission declined to impose either requirement. *Alcoa Power Generating, Inc.*, 156 FERC ¶ 62,210, PP 67–69 (2016) (Licensing Order).

Salisbury had more success at the state level. North Carolina conditioned its water quality certification on the development of a flood protection plan for the pump station. When FERC renewed the license for the dam, this state-imposed requirement became part of the federal license. Licensing Order, 156 FERC ¶ 62,210, P 180, Appendix A.

C

Cube currently operates the Yadkin River dam project. As required by its license, Cube developed a flood protection plan for the pump station. The plan calls for dredging to reduce sediment. To address flooding of the access road, it also calls for electronic upgrades to allow remote operation of the station, as well as an amphibious vehicle to allow physical access in case of emergency. Finally, the plan calls for raising the pump station's equipment above the highest projected flood level. Salisbury objected that raising the equipment would damage the station and violate state building codes. Cube responded that the proposed modifications would be reviewed for engineering soundness and code compliance. North Carolina did not object to the plan in substance, but it required Cube to submit further details for review prior to construction.

FERC approved the plan. It found that Cube's proposal to further elevate the pump station's equipment was consistent with the water quality certification and otherwise reasonable. *Cube Yadkin Generation LLC*, 170 FERC ¶ 62,143, PP 30–31 (2020) (Approval Order). FERC acknowledged Salisbury's preference for a new pump station but noted that Cube's plan

"achieves similar results" at "significantly less" cost—upwards of $16 million for a new pump station, versus $2.8 million to modify the existing structure. *Id.* P 31.

FERC denied rehearing in relevant part. It again approved Cube's proposal to raise the pump station's equipment rather than to build a new pump station. *Cube Yadkin Generation LLC*, 172 FERC ¶ 61,254, P 29 (2020) (Rehearing Order). FERC declined to consider whether Cube's proposal was consistent with state-law siting, design, and water-quality standards. *Id.* P 32. Finally, FERC found inapplicable to the pump station a federal regulation requiring sound engineering practices for hydroelectric dams. *Id.* P 34.

Salisbury petitioned for review of FERC's decision approving the plan to elevate the pump station's equipment. Cube has intervened in support of the Commission. We have jurisdiction under 16 U.S.C. § 825*l*(b).

II

We begin by considering the condition imposed by the North Carolina water quality certification, which requires Cube to develop a flood protection plan for Salisbury's pump station. The parties raise two disputes about the scope of this condition, as well as a dispute about deference.

A

FERC asks us to defer to its interpretation of the condition. It invokes cases stating that the Commission is entitled to deference when construing license conditions that it imposes under the Federal Power Act. *See, e.g.*, *Pacific Gas & Electric Company v. FERC*, 720 F.2d 78, 84 (D.C. Cir. 1983).

We are not so sure that deference is appropriate here, because state-imposed conditions under the Clean Water Act raise distinctive deference questions. That Act preserves a primary role for the states in regulating emissions into navigable waters. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). Accordingly, FERC "may not alter … conditions imposed by the states" in a water quality certification. *U.S. Dep't of Interior v. FERC*, 952 F.2d 538, 548 (D.C. Cir. 1992); *see also Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991) (Clean Water Act permits states "to block, for environmental reasons, local water projects that might otherwise win federal approval"). Given this assignment of substantive authority to the states, we are reluctant to vest in FERC the interpretive authority to resolve ambiguities in water-quality certifications as it thinks best.

We reserve the deference issue. As explained below, we conclude that FERC has adopted the best interpretation of the disputed condition, so we need not decide who must yield when the agency and the court reach competing reasonable interpretations. *See*, *e.g.*, *Truck Trailer Mfrs. Ass'n v. EPA*, 17 F.4th 1198, 1201 n.1 (D.C. Cir. 2021).

B

The condition at issue requires Cube to develop a flood protection plan that includes:

> [1] Physical modifications to the facilities such as a protective dike for the pump station, [2] improved access to the pump station with the road consistent with the City of Salisbury's design or [3] other feasible option(s) for achieving the same benefits.

Licensing Order, 156 FERC ¶ 62,210, P 180, Appendix A. As shown above, this text has three clauses: The first requires *physical modifications* to the pump station facilities. The second requires *improved access* to the pump station. The third permits *other feasible options* in place of the first two.

The parties' first interpretive dispute centers on the phrase "consistent with the City of Salisbury's design" in the second clause. The parties agree that it governs provisions for *improved access* to the pump station. But Salisbury reads the phrase as qualifying the first and third clauses as well as the second. So while the first clause requires physical modifications "such as a protective dike," Salisbury contends that any physical modifications must also be consistent with the city's design. Likewise, while the third clause permits other options that achieve the "same benefits" as physical modifications, Salisbury contends that these options must achieve not only the same benefits as a dike, but also the same benefits as the city's design. And since the city asked for Cube to build it a new pump station, Salisbury concludes that any physical modifications, or other options in their place, must afford the same benefits as a new pump station.

This proposed construction is untenable. Under the rule of the last antecedent, "a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). If that noun or phrase does not fit, the limiting clause should then be read to modify "the nearest reasonable referent." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012); *see Grecian Magnesite Mining, Indus. & Shipping Co. v. Comm'r*, 926 F.3d 819, 824 (D.C. Cir. 2019) ("ordinarily, and within reason, modifiers and qualifying

phrases attach to the terms that are nearest"). Here, the nearest referent is the noun "access" or, alternatively, the noun phrase "improved access to the pump station with the road." Those referents fit naturally with the limiting phrase "consistent with the City of Salisbury's design," as Cube's access plan must integrate with the city's existing road network. And because the nearest referent is also a reasonable one, there is no basis for reading the limiting phrase to modify other, more-distant language in the first or third clauses of the condition.

In contrast, Salisbury would have the phrase "consistent with the City of Salisbury's design" qualify the more remote noun "modifications." That is not grammatically possible. In some circumstances, an adjectival phrase may modify each of the nouns in a preceding list, through what is called the series-qualifier canon. But for that canon to apply, the nouns must appear in a "straightforward, parallel construction," *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (quoting *Reading Law*, *supra*, at 147), as in the phrase "the laws, the treaties, and the constitution of the United States," *see Lockhart*, 577 U.S. at 352 (cleaned up). Here, the relevant syntax is anything but straightforward or parallel. In the second clause of the condition, the central noun *access* is modified by one adjective ("improved") and two prepositional phrases ("to the pump station" and "with the road") as well as by the contested phrase "consistent with the City of Salisbury's design." In the first clause, the central noun *modifications* is modified by one adjective ("physical") and one prepositional phrase ("to the facilities") and is illustrated by a phrase of two prepositional phrases ("such as a protective dike for the pump station"). Given all these "internal modifiers or structure," the phrase *consistent with the City of Salisbury's design* simply cannot skip over 21 intervening words, six intervening nouns, and five intervening prepositional phrases to qualify *modifications* as

well as *access*.  *See id.*; *see also Yellen v. Confederated Tribes of the Chehalis Reservation*, 141 S. Ct. 2434, 2455 (2021) (Gorsuch, J., dissenting).

Nor can the phrase modify the third clause in the way that Salisbury urges.  Introduced by the conjunction *or*, the third clause permits other options "for achieving the same benefits" as the required physical modifications or improved access.  For access improvements, these other options must achieve the same benefits as improved access "consistent with the City of Salisbury's design."  But for physical modifications to the pump station, the other options must achieve the same benefits as modifications "such as a protective dike."  In short, because *consistent with the City of Salisbury's design* qualifies *improved access* but not *physical modifications*, it likewise qualifies "other feasible options" for improved access, but not for physical modifications.

C

Any modification to pump station facilities must offer the "same benefits" as a protective dike, but what are those benefits?  The parties agree that a plan must enable the station to continue operating during a flood.  Salisbury asserts that a plan must also ensure that the station itself remains entirely dry.

A "benefit" is a "useful aid" or something that "promotes well-being."  *Fischer v. United States*, 529 U.S. 667, 677 (2000) (quoting *Webster's Third New International Dictionary* 204 (1971)).  As this definition implies, what counts as a benefit must be understood in relation to some underlying goal—a useful aid *for what*?  *See id.* at 677–80.  Ice covering a lake is a benefit for skating, but not for swimming.

Salisbury built its pump station to operate, but not remain entirely dry, during floods. According to its own expert, the whole point of housing the station's mechanical and electrical equipment in elevated rooms was to permit operations when flood waters submerged the lower portion of the station. J.A. 87. And since 1917, this design has achieved that objective even though floods have reached high up the station's outer walls. FERC thus correctly concluded that the relevant "benefits" are those flowing from continued operation of the pump station, consistent with its original design and with understandings prevailing for more than a century. The pump station was never designed to ensure dry walls and dry floors even during floods, and we see no textual or other indication that North Carolina required Cube to provide Salisbury with the substantial and expensive upgrade that would be necessary to secure those benefits.

To the extent Salisbury further contends that a plan must prevent flood waters from entering the inside of the pump station, its position runs into another fatal difficulty: Even a protective dike would not afford that benefit. Only one of the engineering reports in the record recommends a dike to protect the pump station. But as that report makes clear, a dike by itself would not prevent flooding inside the station, because flood water enters through a wet well inside the station. J.A. 56. So even if the flood plan had to offer all the benefits of a dike, permanently dry floors would not be among them.

Salisbury contends that the residual clause requires "benefits" in the plural, and thus must provide for more than just the continued operation of the pump station. But the residual clause requires the "same benefits" as those afforded by modifications to the facility itself *and* improvement of its access road. Any plan that achieves these two objectives will

necessarily offer more than one benefit. Moreover, keeping the station operational could itself plausibly be described as ensuring different benefits. For example, Salisbury itself describes the station as providing both "potable and fire-fighting water" for its residents. Salisbury Br. at 1.

## III

We turn now to FERC's decision to approve Cube's flood plan. In reviewing it, we must accept findings of fact supported by substantial evidence. 16 U.S.C. § 825*l*(b). We must also consider whether the decision is arbitrary and capricious under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A); *see Long Island Power Auth. v. FERC*, 27 F.4th 705, 712 (D.C. Cir. 2022). A decision is not arbitrary if it is "reasonable and reasonably explained." *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018).

## A

FERC reasonably concluded that Cube's plan will enable the pump station to continue operating during floods. As the Commission explained, the pump station was designed to keep sensitive equipment above the water line even when its lower portions flooded. *See Rehearing Order*, 172 FERC ¶ 61,254, P 28 n.55. And Cube proposed to further elevate this equipment to account for rising water levels caused by the dam. *Id.* at P 29. FERC thus reasonably explained the rationale for both Cube's plan and its approval decision.

Substantial evidence supports FERC's decision. As the Commission explained, the American Society of Civil Engineers recommends, and North Carolina law requires, essential structures to be placed two to three feet above the expected level of a once-in-a-century flood. *Rehearing Order*,

172 FERC ¶ 61,254, P 10 n.25.  And Cube's plan calls for raising the pump station's sensitive equipment a full 3.6 feet above that mark.  *See id.* P 10.  Indeed, during the plan's consultation period, Salisbury's expert agreed that raising sensitive equipment to that altitude would satisfy the water quality certification.  J.A. 467.

B

Salisbury presses three arguments why FERC's approval order nonetheless was arbitrary.  None persuades us.

*First*, Salisbury contends that FERC was required to consider whether Cube's flood plan would violate North Carolina's design, siting, electrical, and building codes.  But the Federal Power Act reflects a separation between "subjects which remain under the jurisdiction of the States" and those "over which Congress vests [FERC] with authority to act." *S.C. Pub. Serv. Auth. v. FERC*, 850 F.2d 788, 795 (D.C. Cir. 1988) (quoting *First Iowa Hydro-Electric Coop. v. FPC*, 328 U.S. 152, 168 (1946)).  So while the Act empowers FERC to exercise "operational control" over federal power projects, *Simmons v. Sabine River Auth.*, 732 F.3d 469, 476 (5th Cir. 2013), non-project facilities that lie outside project boundaries "remain[] under the jurisdiction of the States," *S.C. Pub. Serv. Auth.*, 850 F.2d at 795 (cleaned up)

Given this division of authority, FERC permissibly declined to assess whether Cube's plan complied with state law.  It is one thing for FERC to police compliance with state-mandated conditions incorporated into a federal license by operation of federal law, as FERC did here.  But it is quite another for FERC to police compliance with state law generally:  What North Carolina's building code has to say

about improvements to Salisbury's pump station is a question best left to North Carolina. Salisbury can raise any state-law objections to the plan with the appropriate state regulatory agencies. And in the unlikely event that it should be harmed by operation of the dam, Salisbury can seek tort damages—a remedy that the Federal Power Act expressly preserves. 16 U.S.C. § 803(c); *see*, *e.g.*, *Portland General Elec. Co.*, 107 FERC ¶ 61,158 PP 27–33 (2004). FERC did not act arbitrarily in applying these settled rules to the pump station, which it aptly described as a "non-project facilit[y] located on non-project lands." *Rehearing Order*, 172 FERC ¶ 61,254, P 19.

*Second*, Salisbury contends that FERC arbitrarily refused to consider whether Cube's flood protection plan was consistent with sound engineering practices. Salisbury rests that claim on 18 C.F.R. § 12.5, which requires a FERC licensee to use such practices in designing, constructing, or modifying a "water power project or project works." By its terms, section 12.5 does not apply to Salisbury's pump station, which exists not to generate power, but to help turn river water into drinking water. We note that the North Carolina State Building Code, like section 12.5, requires "good engineering practice." N.C. Gen. Stat. § 143-138(c). But for the reasons explained above, FERC was not compelled to police compliance with that state-law provision.

*Third*, Salisbury contends that Cube's plan will unreasonably endanger the city's pump station workers. As framed before FERC on rehearing, this argument merely repackaged Salisbury's other arguments that the plan violates North Carolina's building code and is not based on sound engineering practices. To the extent that Salisbury now presses a freestanding argument about worker safety, the argument was not preserved on rehearing before FERC, and we thus have no

jurisdiction to consider it.  *See* 16 U.S.C. § 825*l*(b); *Shafer & Freeman Lakes Envtl. Conservation Corp. v. FERC*, 992 F.3d 1071, 1089 (D.C. Cir. 2021).

## IV

FERC correctly interpreted the water quality certification, and it reasonably approved Cube's flood protection plan.  We therefore deny the petitions for review.

*So ordered.*