# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2007 Decided October 16, 2007

No. 03-1257

GAS TRANSMISSION NORTHWEST CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PROCESS GAS CONSUMERS GROUP, ET AL.,
INTERVENORS

———

Consolidated with
04-1065, 04-1066

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Catherine E. Stetson* argued the cause for petitioners. With her on the briefs were *Lee A. Alexander*, *Stefan M. Krantz*, *James Howard*, *C. Todd Piczak*, and *Carl M. Fink*. *Debra H. Rednik* entered an appearance.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *John S. Moot*, General Counsel, *Robert H. Solomon*, Solicitor, and *Patrick Y. Lee*, Attorney.

Before: GARLAND and KAVANAUGH, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge*.

SILBERMAN, *Senior Circuit Judge*: Two interstate natural gas pipelines seek review of Federal Energy Regulatory Commission ("FERC") orders that limit the amount of collateral pipelines may require from non-creditworthy shippers. Petitioners assert that the orders under review are an unexplained departure from FERC precedent and, in any event, are unreasonable (arbitrary and capricious). We disagree, and we deny the petitions for review.

**I.**

Although we encounter a series of FERC orders,[1] including three orders on rehearing, then a joint request to hold petitions in abeyance pending a rulemaking (which FERC terminated, relying instead on a policy statement), and finally a remand of

---

[1] The orders under review are: *PG&E Gas Trans.*, 101 FERC ¶ 61,280 (2002); *e prime, inc. v. PG&E Gas Trans.*, 102 FERC ¶ 61,062 (2003); *North Baja Pipeline, LLC*, 102 FERC ¶ 61,239 (2003); *e prime, inc. v. PG&E Gas Trans.*, 102 FERC ¶ 61,289 (2003); *PG&E Gas Trans.*, 103 FERC ¶ 61,137 (2003); *e prime, inc. v. PG&E Gas Trans.*, 104 FERC ¶ 61,026 (2003); *North Baja Pipeline, LLC*, 105 FERC ¶ 61,374 (2003); *PG&E Gas Trans.*, 105 FERC ¶ 61,382 (2003); *North Baja Pipeline, LLC*, 115 FERC ¶ 61,141 (2006); *North Baja Pipeline, LLC*, 117 FERC ¶ 61,146 (2006) ("Remand Order").

the record at FERC's request to allow FERC to more fully consider petitioners' arguments, the issue before us is rather simple. Petitioners, apparently stung by recent shipper defaults, wished to amend their tariffs to require non-creditworthy shippers (those who have below investment grade bond ratings) to post twelve months' reservation charges as collateral. The Commission determined that petitioners' proposed tariffs were "unjust and unreasonable"; that as a matter of policy FERC would ordinarily permit only a requirement of three months' reservation charges. The Commission acknowledged that certain pipelines had filed tariffs requiring twelve months' collateral, but those exceptions to its policy fell into two categories: either the tariffs had been filed without protests that caused FERC to focus on the issue, or the longer collateral requirements were explicitly permitted for newly constructed facilities.

Besides asserting that these exceptions were actually inconsistencies in its policy, petitioners contended that a three-month reservation charge was inadequate collateral to cover their "remarketing risk" – the ability to resell the contracted-for pipeline capacity (at the same price). FERC recognized that a three-month collateral requirement might not fully cover petitioners' remarketing risk, but it determined that this risk is a normal cost of doing business and could be addressed as a factor in petitioners' rate of return.

Finally, petitioners contended that their particular situations – both having suffered defaults in recent years – justified a deviation from FERC's policy. The Commission determined, however, that the difficulties petitioners had faced were transitory, caused by unusual events such as the Western energy crisis.

**II.**

Petitioners make a half-hearted attempt to suggest that FERC's decision to abandon a rulemaking on the collateral issue somehow suggests that its policy is really an illegal substantive rule, but there is nothing to their argument. FERC simply decided that a general policy statement would suffice, leaving open case by case determinations. But the Commission was, and is, prepared to defend the application of its policy in individual cases as it has done here, and an agency's policy can just as well be articulated in adjudications as in rulemaking. *SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947). In short, FERC has not sought to rely on the policy *statement*, but rather to defend its policy in the challenged orders. *Guardian Fed. S&L Ass'n v. Fed. S&L Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978).

Petitioners' alleged inconsistencies in FERC's decision are, in our view, adequately explained. With regard to the unchallenged filings, FERC said:

> [I]n the absence of protests, the Commission may simply have accepted these provisions without examining whether they conformed to Commission policy and precedent. Under such circumstances, accepting another pipeline's provisions does not necessarily establish a generic Commission policy or precedent regarding similar tariff provisions.

Remand Order, 117 FERC ¶ 61,146 at 61,786 (2006). We think that position is eminently reasonable. FERC's acceptance of a pipeline's tariff sheets does not turn every provision of the tariff into "policy" or "precedent." *See, e.g., Alabama Power v.*

*FERC*, 993 F.2d 1557, 1565 n.4 (D.C. Cir. 1993); *Nevada Power Co.*, 113 FERC ¶ 61,007 at 61,013-14 (2005) (refusing to treat a rate calculation from a prior tariff as precedent because "the issue was not raised, and the Commission did not discuss it or rule on it"). When a proposed tariff with more than a three-month collateral requirement has been challenged by shippers, FERC has required pipelines to amend their filing to comply with its policy. *See Valero Interstate Trans. Co.*, 62 FERC ¶ 61,197 at 62,397 (1993).

Petitioners nevertheless contend that FERC's practice puts them at a competitive disadvantage *vis-a-vis* pipelines whose nonconforming collateral provisions in their tariffs escaped scrutiny. But as FERC's counsel assured us at oral argument, if petitioners, or anyone filing a complaint, challenged those tariff provisions, the Commission would apply its three-month policy.

Apparently, however, two pipelines in direct competition with petitioners (Alliance Pipeline and Northern Border Pipeline) have twelve-month collateral requirements that are not subject to challenge. That is because they fall within another exception to FERC's policy. The Commission, as we noted, permits pipelines to impose a twelve-month collateral requirement on newly constructed facilities, and those pipelines are such. Petitioners contend that this policy is arbitrary and capricious because the Commission has not adequately explained its differential treatment of new pipelines and existing pipelines. To be sure, FERC's initial explanation for treating tariffs on new facilities differently is, as petitioners recognized, economically faulty. FERC said, "[O]nce the pipeline is in service, the construction costs are sunk (have already been expended), so the ongoing financial risk to the pipeline is less . . . ." *PG&E Gas Trans.*, 103 FERC ¶ 61,137 at 61,472 (2003).

Actually the financial risk is the same whether the pipeline is already built or not. But in its rehearing order, FERC explained reasonably that pipelines and their financing institutions' reliance interests for new investment justify the longer collateral requirement. "[T]he pipeline is under no obligation to construct facilities, and the pipeline as well as its lenders have an interest in ensuring a reasonable amount of collateral from the initial shippers supporting the project before committing funds to the project." *PG&E Gas Trans.*, 105 FERC ¶ 61,382 at 62,700 (2003).

\* \* \*

Alternatively, petitioners re-argue before us that the Commission's policy ordinarily limiting collateral to three months' reservation charges is unreasonable because it does not cover the remarketing risk. Petitioners concede that a pre-paid three-month charge will typically protect the pipeline against a non-payment risk because normally the pipeline will be able to discontinue service to the shipper in default within three months.[2] But that does not cover the pipeline against its remarketing risk. If the pipeline cannot find a replacement for the defaulting shipper, it would have unused capacity. The Commission acknowledges that the pipelines have this risk, but FERC concluded that it was an ordinary business risk and therefore should be factored into the pipeline's rate of return – which is another way of saying the cost of that risk should be spread over all the pipeline's customers. Petitioners assert that

---

[2]The pipeline would have to seek the Commission's approval before it terminated service to the shipper in default, termed an abandonment. But, contrary to petitioners' contentions, there is no reason to believe that FERC would not grant a pipeline's abandonment request if a non-creditworthy shipper failed to post the required amount of collateral.

FERC's approach is inconsistent with its policy of ordinarily attributing a pipeline cost to the one shipper who is responsible for the cost. But FERC has never proclaimed that as an absolute rule. *See K.N. Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992) (noting that pipeline rates must reflect "to some degree" the costs caused by the customer paying the rates).

FERC rejected a collateral charge of more than three months in the normal situation because a greater charge was thought to hinder the Commission's policy of eliminating entry barriers and promoting "open access" to pipeline services. Of course, "open access" is just another way of saying that the Commission seeks to maximize the number of shippers in order to increase the country's supply of natural gas. Here, FERC chose to promote this policy by encouraging the non-creditworthy marginal shipper's entry into the market. Some remarketing risk may be spread to creditworthy shippers, but the Commission believes its policy is justified by the beneficial effects on open access, and the resulting increase in the supply of natural gas. That strikes us as the sort of policy call entrusted to the Commission – not to us.

Petitioners complain, however, that they have no assurance – despite FERC's claim – that they will be adequately compensated in the rate of return for remarketing risk. Counsel for the Commission assured us, however, that it was a legitimate factor to be considered, and it is certainly premature for petitioners to speculate that FERC will not permit them an adequate rate of return. In at least one prior case, FERC has considered the effects of remarketing risk while determining the proper rate of return for a natural gas pipeline. In the *Ozark* ratemaking proceeding, the Commission set Ozark Gas Transmission's return on equity "at the top of the zone of

reasonableness" because of several factors related to credit risk. *Ozark Gas Trans. Sys.*, 68 FERC ¶ 61,032 at 61,107-08 (1994). FERC noted that "one of Ozark's two principal customers . . . is involved in bankruptcy proceedings, and at this point, still could choose to reject its contract with Ozark." *Id.* at 61,108. Ozark also had "substantial excess capacity" and faced "considerable competition" from other pipelines in the region. *Id.* In other words, the Commission was willing to increase Ozark's rate of return to compensate the pipeline for its relatively high credit risk and remarketing risk.

\* \* \*

Finally, petitioners claim that they face unique challenges. GTN complains that it has faced twelve defaults in recent years, and its primary markets (Northern California and the Pacific Northwest) are likely to experience slower growth in the future. But FERC determined that the defaults by GTN's shippers were "isolated," and "appear to be related to or a result of an unusual event, the western energy crisis." Remand Order, 117 FERC at 61,784-85. The Commission also emphasized that "GTN has failed to show that northern California markets will not be steady or continue to grow over time, regardless of the isolated bankruptcies of a handful of shippers." *Id.* at 61,785. We see no reason to second guess these factual determinations, since "[t]he court properly defers to policy determinations invoking the Commission's expertise in evaluating complex market conditions." *Tennessee Gas Pipeline Co. v. FERC*, 400 F.3d 23, 27 (D.C. Cir. 2005).

North Baja, for its part, claimed that it faced a default from one out of five shippers, or 20% of its customer base. The Commission responded that despite this default, North Baja was "95 percent subscribed for long term firm capacity." Remand

Order, 117 FERC at 61,785. Given that the pipeline was operating at nearly full capacity, FERC rejected reasonably North Baja's assertion that it was in a "tenuous position" with respect to credit risk.

## III.

For the aforementioned reasons, the petitions for review are

*Denied*.