# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 22, 2018    Decided September 21, 2018

No. 16-1285

ANR STORAGE COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NORTHERN STATES POWER COMPANY - MINNESOTA, ET AL.,
INTERVENORS

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Mark Sundback* argued the cause for petitioner. With him on the briefs were *Kenneth Wiseman* and *William Rappolt*. *Kevin Siqveland* entered an appearance.

*Lona T. Perry*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Robert I. White*, *Nancy A. White*, *James H. Holt*, *Douglas F. John*, and *Matthew T. Rick* were on the joint brief of

intervenors Canadian Association of Petroleum Producers, et al. in support of respondent.

Before: HENDERSON and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The Federal Energy Regulatory Commission refused to allow ANR Storage Company to charge market-based rates, as opposed to cost-based rates, for its natural-gas storage services. That decision rested on FERC's conclusion that ANR had failed to prove that it lacks market power. ANR challenges FERC's decision as both inconsistent with prior precedent and internally inconsistent.

I

Section 4(a) of the Natural Gas Act requires natural-gas companies to charge "just and reasonable" rates in interstate markets subject to FERC's regulatory jurisdiction. 15 U.S.C. § 717c(a). This requirement governs not only suppliers of natural gas, but also suppliers of natural-gas storage services. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 295 n.1 (1988). FERC generally considers cost-based rates to be "just and reasonable," and it allows market-based rates only if the seller shows that it lacks power in the relevant markets. *N. Nat. Gas Co. v. FERC*, 700 F.3d 11, 13 (D.C. Cir. 2012).

FERC assesses market power in three steps: first, it defines the relevant product and geographic markets; second, it calculates share and concentration within those markets; and third, it considers other relevant factors. *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines*, 74 FERC ¶ 61,076, 61,231 (1996) (*1996 Policy*

2

*Statement*).  The relevant product market includes both the specific service supplied by the firm at issue and "good alternatives," which FERC defines as any other service "that is available soon enough, has a price that is low enough, and has a quality high enough to permit customers to substitute the alternative."  *Id.* (citation omitted).  Market share measures a firm's ability to exercise market power unilaterally, whereas market concentration, as determined by the Herfindahl-Hirschman Index (HHI), measures the ability of sellers to exercise market power jointly.  *Id.* at 61,234.[1]  Relevant factors that might prevent the exercise of market power, even for dominant competitors in concentrated markets, include the absence of entry barriers and the presence of countervailing buyer power.  *Id.* at 61,235.

In 2012, petitioner ANR Storage Company sought authorization to charge market-based rates for its natural-gas storage services.  FERC referred the matter to an administrative law judge, who held a hearing, found that ANR had failed to show a lack of market power, and thus declined to authorize market-based rates.  *ANR Storage Co.*, 146 FERC ¶ 63,007 (2014) (*Initial Decision*).

On review, the Commission rejected various aspects of the ALJ's reasoning, but ultimately affirmed his decision.  *ANR Storage Co.*, 153 FERC ¶ 61,052 (2015) (*Opinion No. 538*).  Among other things, FERC determined that the ALJ had erred by defining the relevant product market to exclude intrastate storage capacity as well as subscribed storage capacity

---

[1]  HHI is calculated by squaring the market share of each supplier in the market, then summing those numbers.  HHIs range up to 10,000, the index for a market with only one seller; higher numbers indicate a more concentrated market.  *See* W. Holmes & M. Mangiaracina, *Antitrust Law Handbook* § 6:5 (2017).

committed to specific buyers but subject to release. *See id.* PP 106–08, 162–63. After expanding the relevant product and geographic markets beyond those used by the ALJ, FERC recalculated ANR's share to be 16.12% of the market for working gas and 15.16% of the market for daily deliverability,[2] and it calculated the HHIs for these respective markets to be 951 and 1,010. *Id.* PP 183–213. FERC acknowledged that it had granted market-based rate authority to other natural-gas companies with similar shares, and it characterized the relevant HHIs as "low." *Id.* PP 214–15. However, it expressed concern that ANR was the largest competitor in the market for working gas, and that a significant part of that market consisted of intrastate or subscribed storage capacity. *Id.* P 219. FERC ultimately concluded:

> Based on the size of the applicant in relation to the market, the relative lack of current competitors providing firm interstate storage service, the need for a substantial number of other facilities among the good alternatives to shift operations in order to offer firm interstate service, and also considering the fact that [ANR] is not a new entrant but a strong incumbent, the Commission finds that [ANR] has not met its evidentiary burden to show it lacks significant market power in the relevant markets.

*Id.* P 220.

---

[2] "Working gas" refers to the total amount of gas that may be withdrawn from a facility, whereas "daily deliverability" refers to the amount of gas that can be withdrawn in one day. Given the fluctuating and uncertain demand for natural gas over time, FERC considers both to be important market measures.

After FERC denied rehearing in large part, *ANR Storage Co.*, 155 FERC ¶ 61,279 (2016) (*Rehearing Order*), ANR sought review in this Court. We have jurisdiction under 15 U.S.C. § 717r(b).

II

Under the Administrative Procedure Act, the question before us is whether FERC's refusal to allow ANR to charge market-based rates was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To determine the answer, we focus on the reasons stated in the orders under review; we neither supply our own reasoning for the agency decision, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), nor consider the agency's post-hoc rationalizations, *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 164 (D.C. Cir. 2010). Rather, the agency decision itself must be "reasonable and reasonably explained." *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018). In particular, the decision must give a "reasoned analysis" to justify the disparate treatment of regulated parties that seem similarly situated, *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 21 (D.C. Cir. 2014), and its reasoning cannot be internally inconsistent, *see*, *e.g.*, *Sierra Club v. EPA*, 884 F.3d 1185, 1194–96 (D.C. Cir. 2018).

ANR raises a host of challenges to FERC's decision. We reject most of them, but conclude that two have merit.

A

ANR contends that FERC's finding of market power conflicts with its own precedent. Primarily, ANR argues that shares around 16% cannot establish market power, at least in unconcentrated markets. However, FERC has long

5

recognized that "market shares and HHIs alone do not give a comprehensive view of all important factors." *1996 Policy Statement*, 74 FERC at 61,235. Moreover, we cannot fault FERC's analysis that, even in an unconcentrated market, a 16% share held by "the single largest storage provider," *Opinion No. 538*, 153 FERC ¶ 61,052, P 219, is more concerning than comparable shares held by "new entrants to competitive markets that were dominated by other entities," *id.* P 215. Finally, we reject ANR's contention that FERC's decision is inconsistent with any of the prior reasoned decisions addressed at length by the parties. Instead, we conclude that FERC has reasonably distinguished decisions involving storage providers facing dominant competitors, *e.g.*, *Wyckoff Gas Storage Co.*, 105 FERC ¶ 61,027, PP 47–61 (2003); storage markets linked to large and highly competitive production markets in the Gulf Coast region, *e.g.*, *Copiah Storage, LLC*, 121 FERC ¶ 61,272, PP 24–25 (2007), *reh'g granted on other grounds*, 123 FERC ¶ 61,082 (2008); and interruptible storage service that competes with other related products and services, *e.g.*, *ONEOK Gas Storage, LLC*, 90 FERC ¶ 61,283, 61,955 (2000).

Nonetheless, we agree with ANR on one critical point—that FERC did not adequately distinguish its past decisions involving ANR's principal competitor, DTE Energy Company. As ANR explains, FERC has permitted two of DTE's subsidiary companies, Washington 10 Storage Corporation and Michigan Consolidated Gas Company (MichCon), to charge market-based rates for the last decade. When FERC granted that approval, DTE's market share was over 18% for working gas and 17% for daily deliverability—slightly higher than ANR's current shares. *See* Petition for Authorization to Charge Market-Based Rates at 8, *Wash. 10 Storage Corp.*, Docket No. PR08-26-000 (FERC May 30, 2008); Petition for Authorization to Charge Market-Based Rates at 10, *Mich. Consol. Gas Co.*, Docket No. PR09-10-000 (FERC Dec. 23,

6

2008).    Moreover, DTE was then a strong, established competitor, just as ANR is today.    And by FERC's own reckoning, ANR and DTE appear virtually indistinguishable with respect to their current market power:    Critically, both companies compete in the *same* Central Great Lakes Market for natural-gas storage services.  *See Opinion No. 538*, 153 FERC ¶ 61,052, PP 141, 192–95. [3]    And whereas FERC calculated ANR's shares to be 16.12% of the market for working gas and 15.16% of the market for daily deliverability, *id.* P 213, its figures also indicate that DTE's current shares are 14.48% of the market for working gas and 18.02% of the market for daily deliverability, *see id.* PP 195, 213; J.A. 1495, which hardly seem dispositively different.

Despite these obvious similarities between the two leading suppliers in the relevant markets, the administrative orders at issue barely even mentioned FERC's disparate treatment of the two companies.  The ALJ tersely asserted that the *MichCon* order contained "no substantive analysis," *Initial Decision*, 146 FERC ¶ 63,007, P 453, and the Commission itself simply noted—without further discussion—that the ALJ had declined to follow *MichCon*, *Opinion No. 538*, 153 FERC ¶ 61,052, P 83.  The mere observation that *MichCon* was unreasoned does not satisfy FERC's burden to provide some reasonable justification for treating ANR and DTE differently.

---

[3]   In this case, FERC found that ANR and DTE compete in a "Central Great Lakes" geographic market that encompasses Michigan, Illinois, Indiana, Ohio, and western Ontario.  *See Opinion No. 538*, 153 FERC ¶ 61,052, PP 113, 141, 192–95.  In approving market rates for MichCon, FERC found that MichCon competed in a substantially similar "Great Lakes" geographic market that encompassed Michigan, northern Illinois, northern Indiana, and western Ontario.  *See* Petition at 7–8, *Mich. Consol. Gas Co.*, Docket No. PR09-10-000 (FERC Dec. 23, 2008).

7

Before this Court, FERC suggests two variations on this theme. First, it notes that Washington 10's application to charge market-based rates, unlike ANR's, was unopposed. Putting aside the fact that MichCon's application *was* opposed, this observation, too, fails to provide any reasonable justification for treating ANR and DTE differently. Second, FERC notes that the MichCon approval was effected through an order styled as a settlement, in which FERC purported to agree with MichCon that neither FERC, MichCon, "nor any other party shall be deemed to have approved, accepted, agreed, or otherwise consented to any principle or issue in this proceeding." Letter Order at 4, *Mich. Consol. Gas Co.*, Docket Nos. PR09-10-000, PR09-10-001 (May 21, 2009). Despite this disclaimer, FERC could not lawfully have granted MichCon market-based rate authority unless it concluded that the company lacked power in the relevant market. *See N. Nat. Gas Co.*, 700 F.3d at 13. Moreover, whatever the effect of the MichCon order as a settlement of claims between FERC and MichCon, neither of those parties could contract away FERC's statutory duty—imposed by the APA and owed to all *other* regulated parties—to provide some reasonable justification for any adverse treatment relative to similarly situated competitors. Without more, FERC's observation that its favorable treatment of DTE affiliates was effected through one unopposed order and one settlement provides no such justification.

In its brief to this Court, FERC proposed a different justification for treating DTE better than ANR. According to FERC, when the DTE affiliates sought to charge market-based rates, their market power was checked because DTE's largest competitor—ANR—charged cost-based rates. But when ANR sought to charge market-based rates, its market power posed a greater concern because ANR's largest competitor—DTE—already was charging market rates. We frankly doubt that FERC may pick winners and losers in this way, based on

8

which of two otherwise indistinguishable competitors happens to win a race to the FERC equivalent of a courthouse. Nonetheless, we need not definitively resolve this question now. Because FERC did not even hint at its first-to-apply rationale in the orders under review, we cannot affirm on that basis. *See Chenery Corp.*, 332 U.S. at 196. Accordingly, we need not and do not prejudge whether FERC may develop on remand a reasonable justification for such an approach.

At oral argument, FERC floated one final proposed justification—that the market metrics of Washington 10 and MichCon, as relatively small affiliates of DTE, may be meaningfully different from those of DTE and thus ANR. At first glance, this rationale seems difficult to reconcile with FERC's longstanding practice of attributing to each company the capacity of all affiliates. *See, e.g.*, *Opinion No. 538*, 153 FERC ¶ 61,052, P 193 ("Concerning affiliates, the [1996] Policy Statement requires that applicants aggregate the capacity of affiliated companies into one estimate."). But because this rationale likewise was not asserted in the orders under review, we may not affirm on this ground, and we do not foreclose further development of this point on remand.

On the record before us, ANR and DTE seem indistinguishable as leading competitors with virtually identical shares in the same relevant markets. Because FERC did not provide any reasonable justification for allowing DTE affiliates but not ANR to charge market-based rates, its decision is arbitrary and capricious.

B

ANR also challenges FERC's market-power analysis regarding two particular categories of storage capacity: (i) storage in the intrastate as opposed to interstate market, and (ii)

9

storage already subscribed, but subject to capacity release.[4] FERC trifurcated its analysis of these possible competitive alternatives to ANR's service: first, it included them in the relevant product market; second, it deemed them "good alternatives"; but third, it deemed them not sufficiently good alternatives to constrain ANR's exercise of market power. ANR contends that FERC's analysis on these points was internally inconsistent. We agree.

On the question of market definition, FERC explained that a relevant product market encompasses all goods or services "reasonably interchangeable" with those supplied by the company at issue, consistent with settled antitrust principles. *Opinion No. 538*, 153 FERC ¶ 61,052, P 59 (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Applying that definition, FERC concluded that interstate and intrastate storage services are reasonably interchangeable for two reasons. First, on the supply side of the market, "[f]acilities providing intrastate storage service need only alter their regulatory status in order to provide interstate storage service," *id.* P 107, and such providers can "quickly enter the interstate market upon a price increase," *id.* P 108. Second, on the demand side, "use of existing intrastate storage reduces the overall demand for interstate storage and can serve to discipline an anti-competitive price increase in the interstate storage market." *Id.* FERC therefore concluded that, "while distinctions between intrastate and interstate natural gas markets may be meaningful from a legal

---

[4] "Capacity release" describes a transaction in which the holder of a contract to store or transport natural gas sells that right to another company seeking storage or transportation services. *See, e.g.*, *Pan-Alberta Gas, Ltd. v. FERC*, 251 F.3d 173, 174–75 (D.C. Cir. 2001).

perspective, they are not meaningful from the perspective of market price formation." *Id.*

FERC reinforced these conclusions in its analysis of competitive alternatives. Consistent with the 1996 Policy Statement, FERC stated that "a good alternative must be available soon enough, have a price low enough, and have a quality high enough to permit customers to substitute the alternative for the applicant's service." *Id.* P 142. Then, it concluded that intrastate storage was a "good alternative" to interstate storage. In particular, it determined that suppliers of intrastate storage may obtain the necessary approval from FERC to enter the interstate market "soon enough to potentially discipline any attempt by [ANR] to raise prices above competitive levels." *Id.* P 163. Likewise, it concluded that subscribed capacity "that may reasonably be expected to become available" though a release also was a "good alternative." *Id.* P 162. For these reasons, FERC reversed the ALJ's exclusion from the market of various intrastate and subscribed storage capacity. *See id.* PP 186–211.[5]

FERC then turned on a dime. Despite its inclusion of intrastate and subscribed facilities as good alternatives in the relevant market, FERC found "concerning" the "sheer number" of such facilities that would need to "enter the interstate market with available capacity" in order to constrain ANR. *Id.* P 219.

---

[5] We are uncertain how FERC viewed the relationship between the inquiries into product market and good alternatives. *Compare*, *e.g.*, *Opinion No.* 538, 153 FERC ¶ 61,052, P 60 ("The Commission measures reasonable interchangeability of services in the same manner as it determines good alternatives."), *with id.* PP 58–110, 142–65 (separately analyzing product market and good alternatives). Either way, the point is that FERC repeatedly described intrastate and fully subscribed capacity as economically meaningful substitutes, not merely theoretical ones.

For that reason, together with ANR's status as a market leader, FERC concluded that ANR had not proven a lack of market power. *See id.* P 220. Likewise, on rehearing, FERC reiterated its view that neither the demand nor supply impacts of intrastate and subscribed facilities would prevent ANR's exercise of market power. *Rehearing Order*, 155 FERC ¶ 61,279, P 37.

We recognize that substitutability is a question of degree, so it is possible that, for imperfect substitutes, there may be only limited shifting of consumption or production. Nonetheless, under normal antitrust standards, which FERC affirmatively invoked, *Opinion No.* 538, 153 FERC ¶ 61,052, PP 59–61, it makes little sense to conclude that alternatives *within* the relevant product market do not discipline anticompetitive price increases. To the contrary, the market includes only the "arena within which *significant* substitution in consumption or production occurs," taking into account all relevant "commercial realities." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (emphasis added) (citations omitted). More to the point, FERC itself, in deeming intrastate capacity to be a good alternative within the relevant product market, determined that intrastate suppliers could shift "easily," "quickly," and "economically" into the interstate market, and that "distinctions between interstate and intrastate natural gas … *are not meaningful from the perspective of market price formation.*" *Opinion No.* 538, 153 FERC ¶ 61,052, PP 107–08 (emphasis added). Likewise, FERC included in the market not all subscribed capacity that theoretically might become available, but only capacity "that may reasonably be expected to become available." *Id.* P 162. Given this entire analysis, we fail to see how FERC could then conclude that any "delay" in supply shifts would be intolerably "concerning." *See id.* P 219.

Before this Court, FERC stresses that Opinion No. 538 engaged in a detailed analysis of each of ANR's possible competitive alternatives. True enough, but that very analysis determined that the intrastate storage facilities and subscribed facilities at issue *were good alternatives* within the relevant market. FERC did not suggest that these facilities would be incapable of checking ANR. *See Opinion No. 538*, 153 FERC ¶ 61,052, PP 186–210.

The intervenors, who include customers and competitors of ANR, press a different point. They contend that, even if it is relatively easy for intrastate storage providers to obtain from FERC the necessary regulatory approval to provide interstate storage services, intrastate providers face various *other* restrictions on such shifting—including prohibitions imposed under state, local, or Canadian law. Because FERC did not adopt such reasoning in its administrative orders (or even in this Court), we cannot affirm on that basis. *See Chenery Corp.*, 332 U.S. at 196. Again, however, we leave the issue open for further exploration on remand.

There may be good reasons why intrastate or fully subscribed facilities would not check ANR's exercise of market power, but FERC's conclusion to that effect is inconsistent with most of it analysis on this point. Because FERC's decision is internally inconsistent, it is arbitrary and capricious.

C

ANR's other contentions lack merit. We note them only briefly, to avoid unnecessary litigation on remand.

First, ANR challenges certain adverse rulings made by FERC on rehearing: the exclusion from the relevant market of

13

two previously included competitors (Dominion Transmission and NiSource, Inc.) and the attribution to ANR of the entire storage capacity of an affiliated company (Eaton Rapids). We find no error in these rulings, which would have increased ANR's market shares at least slightly above the ones calculated in Opinion No. 538. Because FERC has not yet assessed the significance of these rulings, if any, we leave that issue open on remand.

Second, ANR contends that FERC made certain computational errors in Opinion No. 538 itself. On rehearing, FERC concluded that these alleged errors were immaterial to its overall assessment. We cannot disagree, though we expect FERC to correct any outstanding errors on remand if it chooses to perform new calculations to account for its changed position regarding Dominion, NiSource, and Eaton Rapids.

Finally, ANR contends that FERC failed to adequately consider other factors bearing on market power, such as the asserted lack of entry barriers and the mitigating measures proposed by ANR to protect its customers. We conclude that FERC permissibly rejected these arguments.

### III

For the reasons given, we grant the petition for review, set aside the Commission's orders, and remand for further proceedings consistent with this opinion.

*So ordered.*