# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 17, 2019          Decided March 27, 2020

No. 18-1298

BALTIMORE GAS AND ELECTRIC COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MARYLAND OFFICE OF PEOPLE'S COUNSEL AND MARYLAND
PUBLIC SERVICE COMMISSION, INTERVENORS

———

On Petition for Review of Orders of the Federal Energy
Regulatory Commission

———

*Matthew E. Price* argued the cause and filed the briefs for petitioner.

*Jared B. Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *James P. Danly*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Stephen C. Pearson* argued the cause for intervenors. With him on the brief were *Miles H. Mitchell*, *Ransom E. Davis*,

*Paula M. Carmody*, *William F. Fields*, *Joseph G. Cleaver*, and *Scott H. Strauss*.

Before: HENDERSON and RAO, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS with respect to Parts I, II, and IV.

Opinion for the Court filed by *Circuit Judge* RAO with respect to Part III.

Dissenting Opinion filed by *Senior Circuit Judge* WILLIAMS with respect to Part III.

WILLIAMS, *Senior Circuit Judge*: This case arises out of the Federal Energy Regulatory Commission's effort to apply its "matching" principles to divergences between the timing of deductions for tax purposes and timing for purposes of allocating costs to ratepayers. While Congress and other bodies imposing taxes may want to allow early depreciation of an asset (to encourage investment), for example, the Commission wants a cost (less offsetting tax benefits) to be charged in the period over which the resulting asset provides services to the utility's customers.

I.

In December 2016, Baltimore Gas and Electric Company ("BGE") filed a new rate proposal with the Commission under § 205 of the Federal Power Act, 16 U.S.C. § 824d. The proposal sought a net recovery of approximately $38 million from future ratepayers relating to various costs incurred by BGE dating back to 2005. It is undisputed that consumers had not been charged for these costs between 2005 and the 2016 filing.

The relevant items are in fact a good deal more complicated than the accelerated depreciation example used above, but their details do not affect the issues before us. They arise from (1) a transition problem posed by a switch in Commission handling of such matters, (2) a change in tax rates, and (3) differences between ratemaking and tax treatments of the equity component of construction costs. The sums involved in the first and third categories totaled about $42 million, offset by about $4 million in the second (which BGE proposed to return to the ratepayers). FERC expects utilities to track these amounts according to Financial Accounting Standard 109 ("FAS 109"), a financial accounting and reporting standard promulgated by the not-for-profit Financial Accounting Standards Bureau intended to set forth recording requirements to facilitate "tax normalization," i.e., resolution of timing differences exemplified by the matters discussed above. *See* FERC Br. 12; Accounting for Income Taxes, FERC Docket No. AI93-5-000 (Apr. 23, 1993) ("1993 Guidance").

FERC denied BGE's request to recover these amounts, declining to find BGE's proposed rate "just and reasonable," as required by § 205(a). Specifically, it found BGE's request in violation of the procedural requirements that it had developed for implementation of the matching principle in this context and had stated in its order, *Regulations Implementing Tax Normalization for Certain Items Reflecting Timing Differences in the Recognition of Expenses or Revenues for Ratemaking and Income Tax Purposes*, Order No. 144, FERC Stats. & Regs. ¶ 30,254 (1981). Order No. 144 requires that any such adjustment "be made in the applicant's next rate case following applicability of the rule." *Id.* at ¶ 31,519. It also requires applicants "to begin the process of making up deficiencies in or eliminating excesses in their deferred tax reserves so that, within a reasonable period of time to be determined on a case-

by-case basis, they will be operating under a full normalization policy." *Id*. at ¶ 31,560.

FERC concluded that BGE had breached the requirements of Order No. 144 by failing to file for recovery of these amounts in its "next rate case," which, according to FERC, was BGE's 2005 rate filing. Order Rejecting Proposed Tariff Revisions, *PJM Interconnection, LLC*, 161 FERC ¶ 61,163 (2017) ("Order"). On requests for clarification and rehearing, the Commission made clear its position that the "reasonable period of time" requirement of Order No. 144 "was intended to work in conjunction with the 'next rate case' requirement," so that it does not "negate the requirement that applicants must seek recovery in their next rate case." Order on Rehearing and Clarification, *PJM Interconnection, LLC*, 164 FERC ¶ 61,173, at P 18 (2018) ("Rehearing Order").

Although neither party speaks directly to the issue, we take it that, for purposes of this case anyway, the "next rate case *following applicability of the rule*" is the "next rate case" after the utility has incurred an item (including either a cost or a benefit) requiring "normalization" under Order No. 144 and the 1993 Guidance, not counting periods in which a rate case or settlement had itself normalized the treatment of the item (or adequately addressed its normalization). Indeed, even though FERC denied recovery of such amounts for years past, its denial was without prejudice to BGE's recovery of FAS 109 amounts properly allocable to future years, leaving open BGE's opportunity to achieve normalization prospectively. *See* Rehearing Order at PP 37–38; *see also* FERC Br. 15.

BGE petitioned for review and claims that FERC's application of Order No. 144 was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), misapplying the "next rate case" and "reasonable period of time" requirements. BGE also asserts that FERC erred in

failing to recognize BGE's 2006 settlement of the 2005 rate case as an example of the sort of settlement briefly discussed in Order No. 144. That order had said that it left "undisturbed the ability of the parties to reach a settlement on any of the issues covered by the rule." Order No. 144 at ¶ 31,519. BGE argues the settlement qualified under Order No. 144 and as a result preserved BGE's ability to recover the FAS 109 amounts here at issue.

For the reasons developed below we find that FERC's orders were not arbitrary and capricious and therefore deny the petition for review.

II.

We begin with the 2006 settlement agreement, which BGE claims preserved its right to recover FAS 109 amounts dating back to 2005. As BGE acknowledges, BGE Br. 32 n.5, we have long applied *Chevron* deference to FERC's reasonable interpretations of settlement agreements it approves, *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987), and we do so here. The question before us is whether FERC's determination that BGE's settlement agreement did *not* preserve FAS 109 amounts for recovery in a later rate case filing is "reasonable and reasonably explained," *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018), which we answer in the affirmative. BGE's arguments that FERC is wrong in its application of Order No. 144's settlement provision are not convincing.

The rate filing by BGE that led to the 2006 settlement expressly excluded the FAS 109 amounts, and line items in a spreadsheet attached to the ultimate agreement described certain amounts as "net of" or "less" FAS 109 amounts. BGE claims that the spreadsheets and contemporaneous testimony explaining the same indicate that the parties intended these

amounts to be recoverable at a later date. BGE Br. 45; BGE Add. 34. But the Commission observed that the settlement "did not expressly reserve deferred income tax issues," but rather, "was silent on this point." Rehearing Order at PP 16–17. That seems an apt characterization. A mere description of how the parties calculated figures says nothing about an intent to agree on later recovery of amounts not included in the calculation, especially as such a recovery, starting after lapse of the settlement but allowing recovery of amounts properly due over the settlement's time in effect, would have seriously compromised the Commission's matching principle. It is thus hard to see more in the settlement references than an agreement to disagree. And FERC's insistence that a settlement do more than that fits comfortably within Order No. 144's admittedly vague language on settlements.

BGE suggests that because 18 C.F.R. § 35.24 "*require[s]* utilities to adopt some mechanism to pass through FAS 109 amounts to customers," the settlement agreement's near silence should be understood as merely leaving undisturbed a background expectation that FAS 109 amounts will eventually be recovered. BGE Br. 49 (emphasis in original). But while the heading of § 35.24(b)(1) reads, "Tax normalization required," and the text goes on to specify details for fulfillment of the requirement, understanding normalization as a requirement is entirely consistent with Order No. 144's imposing *conditions* on utilities' recovery of deferred tax amounts and with the Commission's reading the Order's language on settlements as requiring more than the opaque treatment applied in the 2006 settlement. Indeed, as the Commission requires normalization in order to fulfill the matching principle, it would seem to contradict itself if it allowed the 2006 settlement's language to allow indefinite postponement of a utility's recovery of FAS 109 amounts. FERC reasonably interpreted its regulations and the settlement agreement to mean that BGE simply failed to

comply with 18 C.F.R. § 35.24 *by its next rate case*, as required by Order No. 144.

BGE also introduces information about its rates *before* 2005, pointing to settlements reached in 1996 and 1997, and conjures a new argument out of the settlements. These were "black box" settlements, meaning that they stated rates without linking the dollar amounts to specific inputs. BGE argues that these should be "presumed," BGE Br. 16–17, 24, 33, to have addressed the FAS 109 amounts, and that therefore *they* fulfilled Order No. 144's "next rate case" requirement. The Commission responds, accurately, that BGE never made such an argument in its petition for rehearing, and that accordingly it's not properly before us. *See* 16 U.S.C. § 825*l*(b). We therefore do not address it. We confess ourselves unclear as to just how recovery of FAS 109 amounts in 1996–2005 (assuming it occurred), followed by a gap from 2005 to the effective date of BGE's 2016 filing, could satisfy the matching principle as to amounts properly allocable to that period.

III.

Finally, BGE argues that, notwithstanding the requirements of Order No. 144, FERC has been more permissive with four "similarly situated" utilities and fails to explain its disparate treatment of BGE's filing. BGE Br. 38–42; BGE Reply Br. 15–21.

On arbitrary and capricious review, FERC bears the burden "to provide some reasonable justification for any adverse treatment relative to similarly situated competitors." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018). To determine whether an agency must justify a prior contrary decision, therefore, we ask whether the regulated parties at issue are "similarly situated." *See, e.g.*, *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) ("It is

textbook administrative law that an agency must provide[] a reasoned explanation for departing from precedent or treating *similar situations* differently, and Commission cases are no exception.") (citations and quotation marks omitted) (emphasis added); *LeMoyne-Owen College v. NLRB*, 357 F.3d 55, 60–61 (D.C. Cir. 2004) (Roberts, J.) ("An agency is by no means required to distinguish every precedent cited to it by an aggrieved party. But where, as here, a party makes a significant showing that *analogous cases* have been decided differently, the agency must do more than simply ignore that argument.") (citations omitted) (emphasis added).

Here, BGE has made a threshold showing that it is similarly situated to four utilities that received more favorable treatment by the Commission. FERC responds that these four prior actions are not binding precedent because three of them were issued by staff exercising subdelegated authority and none of the four "squarely presented" or "necessarily resolved" the issues presented in this case.[1] FERC Br. 44–48. The agency argues in the alternative that it did reasonably distinguish

---

[1] In *Midcontinent Independent System Operator, Inc.*, 153 FERC ¶ 61,374 (2015), the only order of the four issued directly by the Commission, the utility received approval to recover FAS 109 amounts arising from a 2011 change in tax rates. FERC approved the other three rate filings in letter orders issued by agency staff. *PPL Electric Utilities Corp.*, Letter Order, FERC Docket No. ER12-1397 (May 23, 2012), and *Duquesne Light Co.*, Letter Order, FERC Docket No. ER13-1220 (Apr. 26, 2013), sought recovery of unfunded FAS 109 amounts related to the Pennsylvania Public Utility Commission's decision to pass on certain income tax savings to customers. *Virginia Electric & Power Co.* (*VEPCO*), Letter Order, FERC Docket No. ER16-2116-000 (Aug. 2, 2016), sought FAS 109 amounts related to the equity component of construction costs and a recent tax law change. Each letter order purports to constitute final agency action on the part of the Commission. *See, e.g.*, *id.* at 2 ("This order constitutes final agency action.").

BGE's submission from those in the four prior orders. FERC Br. 49–52. We take each of the Commission's arguments in turn.

A.

First, FERC argues that three of the four prior orders cited by BGE need not be distinguished because they were issued by agency staff under authority subdelegated by the Commission. The agency's regulations delegate to certain staff the authority to "[r]eject" or "[a]ccept for filing all uncontested tariffs or rate schedules" if the filings "comply with all applicable statutory requirements, and with all applicable Commission rules, regulations and orders." 18 C.F.R. § 375.307(a)(1)(i)–(ii).[2]

Setting aside the permissibility of FERC's subdelegation, which is not a question before us, the Commission cannot lend its authority to staff and then disclaim responsibility for the actions they take. Delegated staff actions are actions of the agency. *See* 5 U.S.C. § 551(13) ("'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof."); *id.* § 551(6) ("'[O]rder' means the whole or a part of a final disposition … other than rule making."); *Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131 n.3 (D.C. Cir. 2007) ("'Agency action' encompasses any reviewable action that an agency might take."). Neither the APA nor our precedents distinguish between binding orders signed by staff and those signed by the Commission for purposes of arbitrary and capricious review. Because staff exercise only authority delegated to them by the

---

[2] Under the Federal Power Act, proposed rates go into effect by operation of law sixty days after filing with the Commission, barring further action by the agency. *See* 16 U.S.C. § 824*d*(d). When filings are "rejected," the Commission treats them as never filed, meaning they cannot lawfully go into effect. *See* 18 C.F.R. § 385.2001(b)(2).

Commission, their decisions to accept, reject, or take other actions on filings are decisions of the Commission until superseded by subsequent agency action. 18 C.F.R. § 385.1902(a) ("Any staff action … taken pursuant to authority delegated to the staff by the Commission is a final agency action that is subject to a request for rehearing.");[3] *see also Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) ("[W]e have previously defined 'order' expansively to include *any agency action* capable of review on the basis of the administrative record.") (citation and quotation marks omitted).

FERC must exercise its statutory authority in accordance with the APA, and its decision to delegate to staff cannot erase the requirements of reasoned decisionmaking. Procedural differences between this case, in which the Commission rejected BGE's filing, and cases decided by staff letter orders are insufficient standing alone to justify disparate treatment of similarly situated utilities. It is not enough for FERC to say, "the staff did it." Reasoned decisionmaking requires FERC to explain differential treatment under the same rules. *See ANR Storage*, 904 F.3d at 1024 (citing *W. Deptford*, 766 F.3d at 20).

## B.

Second, FERC maintains that the four prior orders need not be distinguished because none "squarely presented" or "necessarily resolved" the issue in this case. Specifically, the

---

[3] Whether those actions would be reviewable without further exhaustion of administrative remedies is, of course, a different question. *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless … urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."). In this case, BGE raised its arbitrary and capricious argument based on these four prior orders in its request for rehearing before the Commission.

Commission notes the three staff letter orders cited by BGE were uncontested and that none of the four provided a reasoned analysis on the collection of accrued FAS 109 amounts.

These arguments ring hollow because we rejected them in substantially similar form only two years ago. In *ANR Storage Co. v. FERC*, we held in no uncertain terms that distinguishing prior orders in similar cases simply as "unreasoned" or "unopposed" fails to satisfy the APA's reasoned decisionmaking requirement. 904 F.3d at 1025. As our decision emphasized, the duty to explain inconsistent treatment is incumbent on the agency and cannot be waived by the decisions of third parties. *See id.* ("[N]either of those parties could contract away FERC's statutory duty—imposed by the APA and owed to all *other* regulated parties—to provide some reasonable justification for any adverse treatment relative to similarly situated competitors.").

The Commission's attempt to evade this holding pulls from dicta in *San Diego Gas & Electric Co. v. FERC*, in which we approved the agency's rejection of an incentive award despite the granting of the award in prior cases. 913 F.3d 127 (D.C. Cir. 2019). We held that approval of the incentive was not *required* by prior orders because earlier decisions "[did] not amount to policy or precedent." *Id.* at 142 (citation and quotation marks omitted). For this principle, *San Diego Gas* cited an earlier decision in which we required FERC to explain inconsistencies, even though we ultimately concluded such inconsistencies had been adequately explained. *Id.* (citing *Gas Transmission Nw. Corp. v. FERC*, 504 F.3d 1318, 1320 (D.C. Cir. 2007)). Applying longstanding principles of arbitrary and capricious review, *San Diego Gas* maintained the requirement that agencies must reasonably explain disparate treatment of similarly situated parties. Contrary to the view of our dissenting colleague, *San Diego Gas* did not, and could not have, altered settled law.

Our standards for arbitrary and capricious review distinguish between an agency's burden of explanation when announcing new rules and when applying existing rules in individual cases. When an agency seeks to change policy, we assess its actions under the rigorous standards of *FCC v. Fox Television Stations, Inc.,* by requiring the agency to "display awareness that it *is* changing position," show "the new policy is permissible under the statute," and "show that there are good reasons for the new policy." 556 U.S. 502, 515–16 (2009). By contrast, an agency applying existing policy must explain how an outcome coheres with previous decisions. We require agencies to justify different results reached under the same rule in order to lend predictability and intelligibility to the announced standard, promote fair treatment, and facilitate judicial review. *See LeMoyne*, 357 F.3d at 61. If a party plausibly alleges that it has received inconsistent treatment under the same rule or standard, we must consider whether the agency has offered a reasonable and coherent explanation for the seemingly inconsistent results. *See Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006) ("Without a clear presentation of the [agency's] reasoning, it is not possible for us to perform our assigned reviewing function and to discern the path taken by the [agency] in reaching its decision.").

In the view of our dissenting colleague, an agency need not explain disparate outcomes under the same rule unless parties opposed the agency's administration of the rule in the prior cases. Dissenting Op. at 2. Thus, the dissent frames our decision as fashioning a new requirement for agency action. *Id.* at 7. But it cannot be argued "the great principle that like cases must receive like treatment" is anything but black letter administrative law. *NLRB v. Gen. Stencils, Inc.*, 438 F.2d 894, 905 (2d Cir. 1971) (Friendly, J.).

The APA's requirement of reasonableness incorporates basic principles of fair notice and equal treatment inherent to the rule of law. Regulated parties are entitled to know what an agency's rules require and to assume that administration of the rules will be reasonably predictable and coherent across cases. FERC cannot avoid its obligation to provide a reasoned explanation for contrary treatment of "similarly situated" parties solely because those decisions were uncontested or unreasoned. *See ANR Storage*, 904 F.3d at 1025.

## C.

Under our standards for reasoned decisionmaking, FERC fares far better on its final argument: that it in fact provided an adequate explanation to distinguish this case from prior decisions. The Commission reasonably determined BGE waited far longer than the other four utilities to collect accumulated FAS 109 amounts and failed to offer an adequate reason for the delay. *See* Rehearing Order at P 28 (noting *PPL* and *Duquesne* involved delays of four and seven years, respectively, compared to BGE's twelve). Moreover, FERC offered specific ways in which each of the four prior cases differed from BGE's filings in at least one key respect. *See id.* at P 28 n.86 (distinguishing *BGE* from *PPL*, *Duquesne*, and *VEPCO* based on the type of makeup provisions sought and on specific accounting matters), P 30 (noting *Midcontinent* and *VEPCO* sought collection on deficiencies going forward rather than accumulated amounts). Because FERC detailed these differences in the administrative orders rejecting BGE's filing, we conclude the Commission met its burden to reasonably explain the decision. This is enough to survive arbitrary and capricious review.

14

IV.

FERC's rejection of BGE's tariff filing is a reasonable and reasonably explained application of Order No. 144. Accordingly, the petition for review is

*Denied*.

WILLIAMS, *Senior Circuit Judge*, dissenting with respect to Part III:

BGE argues that, notwithstanding the requirements of Order No. 144, FERC has been more permissive with four other "similarly situated" utilities. Pointing to four orders that it views as reaching decisions inconsistent with FERC's ruling here, BGE argues that FERC's rejection of its rate filing, and failure (in BGE's view) to distinguish the prior decisions, violates the standard requirement that agency decisions be reasoned. BGE Br. 38; BGE Reply 15–21.

The majority agrees with BGE that the Commission was obliged to distinguish these orders, but finds that it did so adequately. I believe that under the circumstances the Commission was under no obligation to distinguish the orders, and therefore don't reach the question of whether its efforts to do so were good enough.

I would hold that FERC's duty to distinguish the orders cited by BGE, or to articulate an intentional break with them that would satisfy the requirements of *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009), turns on whether the pertinent issues were "squarely presented and necessarily resolved by the agency" in those past cases, as we held in *San Diego Gas & Electric Company v. FERC*, 913 F.3d 127, 142 (D.C. Cir. 2019). That standard is met if but only if the Commission's seeming resolution of the issue has been clearly opposed (typically by a party opposing the agency's decision though in some cases staff opposition would likely suffice). As far as we know, no such opposition was presented in the generation of the four orders at issue here.[1]

---

[1] I am uncertain whether it should make any difference whether the agency action was by staff or by the Commissioners themselves. Cf. Maj. Op. 9–10. Under my view it would make no

This approach, established in our case law, ensures that any comparisons between new and old cases rest on a clash between an agency rejection of clearly asserted propositions of fact, law or policy, and is analogous to how, in federal courts, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents," *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 510 (1925), and relied on in *San Diego Gas & Electric Co.*, 913 F.3d at 142)).

Given the number of uncontested issues that an agency typically resolves—uncontested, we may infer, either because any adversely affected parties got no notice or, having notice, thought it not worth the trouble to oppose—a requirement that an agency address its past vermicelli, either by reconciling its current decision with the earlier record or by applying *Fox Television*, would tie courts and agencies in linguistic knots for little or no benefit to the rule of law. Indeed, the majority's approach invites a litigant to dive deep into the records of past agency cases, find one with facts loosely comparable to its own case, and then require the agency to adjudicate, *ex post* and likely on a limited record, whether and to what extent each past case is like the present one. Our precedents do not require this.

difference here, because in the four allegedly contradictory decisions neither staff nor Commissioners confronted a claim contrary to their disposition.

As a general matter I agree with the majority that the decisionmakers' lack of reasoning in their prior ruling should not excuse their disregard of an apparent contradiction with that ruling. Maj. Op. 10.

The majority rests its more sweeping view of the agency's duty to distinguish prior cases largely on *ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018). But our decision there appears to have been driven overwhelmingly by the incongruity between the Commission's denying ANR Storage marketing flexibility after having granted the same flexibility to two subsidiaries of DTE Energy that were *direct competitors* of ANR Storage. As measured by FERC's own criterion for granting flexibility—absence of market power in the relevant market—ANR and DTE were nearly identical twins: ANR's market share was substantially the same as DTE's. 904 F.3d at 1025. As we said, "[B]y FERC's own reckoning, ANR and DTE appear virtually indistinguishable with respect to their current market power." *Id.* at 1024–25.

Thus, our primary theme in *ANR Storage* was FERC's wholly unexplained divergence in its treatment of two virtually identical *competitors*. See *id.* at 1024 ("DTE was then a strong, established competitor, just as ANR is today."); *id.* at 1025 (referring to "FERC's statutory duty—imposed by the APA and owed to all other regulated parties—to provide some reasonable justification for any adverse treatment relative to similarly situated *competitors*" (emphasis added)); *id.* at 1026 ("ANR and DTE seem indistinguishable as leading competitors with virtually identical shares in the same relevant markets."). In *ANR Storage*, FERC had offered an astonishing argument (a promising candidate for a chutzpah award) that ANR's "market power posed a greater concern because [its] largest competitor—DTE—already was charging market rates," to which we replied, "We frankly doubt that FERC may pick winners and losers in this way, based on which of two otherwise *indistinguishable competitors* happens to win a race to the FERC equivalent of a courthouse." *Id.* at 1025–26 (emphasis added).

4

*ANR Storage*'s insistence that the Commission confront its different treatment of two competing utilities is, incidentally, boosted by our precedent treating such disparate treatment as a freestanding violation of the FPA's ban on discriminatory rates where two utilities are in competition. In *Dynergy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1125, 1127 (D.C. Cir. 2011), we vacated a FERC order approving a regional transmission organization's method of compensating competing generators for their provision of certain specialized power. The case is distinct from *ANR Storage* in that the competing public utilities were selling the special power to yet another FERC-regulated utility, the regional transmission organization. *Id*. at 1124. But what unifies the cases is they arise from the technologically induced development of competition between power generators subject to regulation under the terms of the FPA—which had been passed in a quite different era, when generators subject to its terms could generally be expected to wield monopoly power. Unlike in *ANR Storage*, there is no suggestion here that any of the firms said to have been treated more favorably than BGE was in any way its competitor.

Besides reversing FERC because of its utterly inconsistent treatment of competitors, *ANR Storage* used language potentially applicable to non-competitive situations. We said, for example, "In particular, [an agency] decision must give a 'reasoned analysis' to justify the disparate treatment of regulated parties that seem similarly situated, *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 21 (D.C. Cir. 2014)." *ANR Storage*, 904 F.3d at 1024. The majority accordingly treats the case as applying that precept even in a case where *no one* opposed the agency ruling in the prior "precedents." Some language of the decision may point that way, but in partial response to a Commission argument that the application for flexibility by one of DTE's two subsidies had been unopposed, we noted that the other subsidiary's application "*was* opposed,"

904 F.3d at 1025 (emphasis in original).  So *ANR Storage* hardly represents adoption of the majority's demanding rule.

Nor do the other cases cited by the majority support its position.  *West Deptford Energy* involved a Commission's switcheroo on whether a generator joining a regional transmission organization should be governed by the tariff in effect at the time it *applied* to join or at the time it actually *joined*.  Four times the Commission had confronted filings by a regional transmission organization proposing the former rule, and four times the Commission had insisted on the latter.  See 766 F.3d at 19–21.  We thought that "the Commission failed, at multiple steps, to provide any reasoned explanation of how its [latest] decision conformed to the Federal Power Act and prior precedent," *id.* at 24, and we therefore required an explanation.  *West Deptford Energy* is thus wholly different from the sort of case, like the instant one, in which the Commission's past treatment of the issue now relevant was uncontested by anyone before the agency.

Similarly, in *LeMoyne-Owen College v. NLRB,* 357 F.3d 55 (D.C. Cir. 2004) (Roberts, J.), the College contested the application of the Board's stated standard for classifying faculty members as managerial employees.  It had called the Regional Director's attention to distinctions between its situations and the cases on which he had relied, as well as to favorable cases that he had ignored—all cases in which the conflict had been clearly posed.  Its claim having been brushed off by the Regional Director, the College raised the point before the Board, which dismissed the matter, "declaring in a one-sentence order that the College had 'raised no substantial issues warranting review.'"  *Id.* at 60.  We thought differently and reversed.  *NLRB v. General Stencils, Inc.*, 438 F.2d 894 (2d Cir. 1971), see Maj. Op. 12–13, is also a standard example of an agency's failing to explain the relationship between the

decision being reviewed and prior *contested* decisions resting on an apparently inconsistent theory.

The majority cites *Point Park University v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006), for the proposition that an agency must explain its reasoning so we can "perform our assigned reviewing function." Maj. Op. 12. While that's of course true, the opinion's concern was with the NLRB's complete failure to present reasoning clear enough to enable the court to discern "the path taken." 457 F.3d at 50. Very specifically, the Board had failed to meet our insistence in *LeMoyne-Owen* that it explain "which factors are significant and which less so, and why." *Id.* (quoting *LeMoyne-Owen*). See also *NLRB v. Yeshiva University*, 444 U.S. 672 (1980). The case in no way fits the majority's idea that an agency must reconcile a decision under review with all prior rulings, even if never contested.

Finally, in *San Diego Gas & Electric Company v. FERC* (mysteriously dismissed as "dicta" by the majority, see Maj. Op. 11), the court acknowledged that FERC had treated like parties differently; FERC denied San Diego Gas recovery of costs incurred before the agency issued an order granting recovery of those costs, whereas FERC had granted similar pre-order costs for other utilities. 913 F.3d 127, 142. We found this apparent inconsistency no cause for reversal. "We have previously held that, '[*i*]*n the absence of protests*,' the Commission's decision to approve rate increases does not amount to 'policy or precedent.'" *Id.* (emphasis added) (citing *Gas Transmission Nw. Corp. v. FERC*, 504 F.3d 1318, 1320 (D.C. Cir. 2007)). Accordingly, we required no explanation of the difference.

In my view, the majority breaks from our sensible and well-reasoned precedents, and I therefore respectfully dissent.